# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION NO. 19-6-01** |
| **VERSUS** | **JUDGE ELIZABETH FOOTE** |
| **JAMES ALBERT MAYO** | **MAGISTRATE JUDGE HORNSBY** |

## MEMORANDUM ORDER

Before the Court is an "Appeal of the Magistrate Judge's Decision Ordering Pre-Trial Detention," filed by the Defendant James Mayo ("Mayo") in the above-captioned matter. Record Document 40. The Government objects to Mayo's request to be re-released on electronic monitoring. Record Document 42. For the reasons that follow, the Magistrate Judge's decision to detain Mayo pending trial is **AFFIRMED**.

## I.      Factual Background.

Mayo was indicted by a federal grand jury on one count of possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C § 922(g). Record Document 1. The Government moved for pre-trial detention. At a hearing on the matter before Magistrate Judge Hornsby, Mayo presented testimony from witnesses, including his uncle, James Ellis ("Ellis"). The testimony established that Mayo and his fiancé, Erica Pitts ("Pitts"), lived with Ellis in an above-garage apartment. Ellis suffers from a number of medical conditions, including Parkinson's, paranoid schizophrenia, cardiac issues, and high blood pressure. Ellis testified that Mayo and Pitts helped to care for him by preparing his meals, helping him bathe, and assisting him in taking his medications.

At the conclusion of the hearing, Magistrate Judge Hornsby decided to release Mayo on a home incarceration bond that required electronic monitoring. The primary reason for this, as evidenced by the transcript of the hearing, was to avoid a disruption in care for Ellis. Magistrate Judge Hornsby told Mayo,

> I'm going to release you . . . so that you can go home and take care of your uncle. . . . You're to be limited to that house. Don't leave that house except for one of two reasons: One, you're taking your uncle to the doctor, or two, you're going to meet with Mr. Woodley. . . . Other than that, you're stuck at home.

Record Document 40-2, p. 32. The court further warned Mayo that if he violated the bond in any way, his bond would be revoked. Id. at 32-33. Finally, the court cautioned, "there's no second chances on this bond. Violate it and you go directly to jail." Id. at 33. Mayo was directed to check with the Probation Officer, Jennifer DeMoss ("Officer DeMoss"), with any questions related to what he could and could not do on electronic monitoring. Mayo was advised to consult with Officer DeMoss to obtain court approval if he needed to travel for any legitimate reason.

Mayo's electronic monitoring equipment contained two essential pieces: the ankle bracelet worn by Mayo and the base unit that stayed plugged in inside the apartment. Because Mayo lived in a second story apartment, there were stairs that had to be accessed to enter or leave the residence. Mayo was informed by Officer DeMoss that the stairs would be out of range of the base unit, and therefore he could not go downstairs. Officer DeMoss told Mayo not to move the base unit for any reason because that would indicate that "someone is trying to relocate it so it looks like they're at that residence when they're actually somewhere else." Record Document 40-3, p. 7.

Mayo's electronic monitoring began on March 6, 2019. On April 3, 2019, Officer DeMoss filed a petition to revoke Mayo's bond based upon ten violations of the conditions of his release. Record Document 23. Specifically, Officer DeMoss submitted that there were eight times between March 28 and April 2 during which Mayo exceeded the range of his electronic monitoring (roughly fifty feet) without prior authorization. At the time of the hearing, Officer DeMoss was not certain of the length of those absences or the time of day when they occurred; she simply knew they had occurred, as evidenced by the data received by the company monitoring Mayo's equipment.[1] In addition to those eight unauthorized absences, there was evidence that the monitoring device's base unit was moved at 3:30 a.m. on March 30, 2019. Finally, the petition represented that Mayo had a thirty-seven minute absence on April 3, 2019, at 2:06 a.m. After DeMoss filed her petition on April 3, 2019, Mayo committed two more violations of his release, on April 4 and April 5, respectively. On the date of the hearing, April 6, Mayo was once again outside of the apartment—downstairs in the yard—when the United States Marshals approached him with an arrest warrant.

At the revocation hearing, Officer DeMoss testified and established the violations outlined above. In response, Mayo testified. He did not deny any of the violations. Rather, he provided explanations to the court in mitigation of his actions. Mayo conceded that Officer DeMoss told him not "to go down the stairs, period, unless I was taking my

---

[1] The monitoring company would not call to alert Officer DeMoss about an unauthorized absence that was less than twenty-nine minutes. Any unauthorized absence longer than twenty-nine minutes would prompt the monitoring company to contact Officer DeMoss immediately.

uncle to the hospital or I was going to see [Mr. Woodley]." Id. at pp. 12-13. Mayo told the court that if he went down the stairs and outside the boundaries of the monitoring equipment, it was usually for three reasons: (1) to assist Ellis down the stairs and into the medical transportation van; (2) to meet his children when they were dropped off by the school bus,[2] or (3) to meet the mother of some of his children who was dropping off or picking up the children. As to the base unit being unplugged, Mayo testified that one of his children was having an asthma attack during the night and his other children inadvertently unplugged the electronic monitoring base while trying to plug in the child's breathing machine. Regarding the thirty-seven minute absence, Mayo testified that during the night while he was sleeping, Pitts had arrived home from work and her car broke down in front of the driveway. Mayo woke up and went outside to push the car back into the driveway to avoid complaints from other residents. Mayo explained that he did not realize he could have or should have contacted Officer DeMoss about such a lengthy absence; he believed it would be rude to call her during the night. Mayo explained that he would do better if permitted to resume electronic monitoring.

Magistrate Judge Hornsby revoked Mayo's bond, explaining that Mayo's three prior drug felonies and prior arrests for domestic abuse counseled against home confinement, but that he had been moved to try electronic monitoring to allow Mayo to help with Ellis's care. However, after repeated violations of the court's pretrial release order, the court was compelled to revoke the bond and detain Mayo. This appeal followed.

---

[2] Pitts testified that the school bus dropped off at 3:30 p.m.

## II.    Law and Analysis.

Pursuant to 18 U.S.C. § 3145(b), a defendant may seek this Court's review of an adverse detention order entered by a Magistrate Judge.   This Court must make an independent determination of the proper pretrial detention or condition of release based upon a *de novo* review of the record.   See United States v. Thibodeaux, 663 F.2d 520 (5th Cir. 1981).

Orders regarding detention and release are governed by 18 U.S.C. § 3142.   A defendant shall be released before trial unless the court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other persons and the community." 18 U.S.C. § 3142(e)(1); see United States v. Fortna, 769 F.2d 243, 249 (5th Cir. 1985) ("[T]he lack of reasonable assurance of either the defendant's appearance or the safety of others or the community is sufficient [to detain a defendant without bond]; both are not required."). The Court applies a clear and convincing evidence standard to determine whether the government has proved that Mayo poses a danger to the community. See 18 U.S.C. § 3142(f)(2)(B) ("The facts the judicial officer uses to support a finding . . . that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence.").   Factors for the Court to employ in making its decision are set forth in 18 U.S.C. § 3142(g) and include the nature and circumstances of the charged offense and whether it involved a firearm; the weight of the evidence against the person; the history and characteristics of the person,

including his criminal history; and the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release pending trial. 18 U.S.C. § 3142(g).

In the instant case, the Court has reviewed the transcripts of the detention and bond revocation hearings and finds that there is adequate support for pretrial detention. The Court's conclusion is bolstered by the additional evidence provided after the hearing by Officer DeMoss. During the hearing, Mr. Woodley asked Officer DeMoss for details on Mayo's shorter unexplained absences. She stated that she did not bring the report with her to court that day. After the hearing, Officer DeMoss used the report to create a summary of Mayo's absences, which she disseminated to the parties and to the undersigned. A copy is hereby attached to this ruling.

In reviewing the § 3142(g) factors, the Court notes that the circumstances of this case did, indeed, involve a firearm. In fact, three firearms were found in the car in which Mayo was riding at the time of his arrest. One firearm, a 9 millimeter, was in the pocket on the back of the front seat, directly in front of Mayo and closer to him than any other occupant of the car.[3] This gun was loaded. In Mayo's pocket, there was a round of 9 millimeter ammunition that matched the ammunition loaded in the 9 millimeter firearm closest to him. Marijuana was also found in the car, and Humphrey testified that she and

---

[3] The Court understands that Adele Humphrey ("Humphrey"), who testified at Mayo's detention hearing, has declared ownership of the 9 millimeter firearm and claims responsibility for putting it in the car. Although the merits of this case are not at issue right now, the Court notes that Humphrey's testimony left many questions unanswered.

Mayo had been smoking marijuana before they were stopped. Evidence at the detention hearing adduced that Mayo has at least four prior felony convictions, and thus is prohibited from possessing a firearm or ammunition. At least three of these prior felonies are drug crimes. In addition, the Magistrate Judge noted Mayo had numerous arrests for domestic abuse. And this Court notes that between the time Mayo was arrested on this firearm charge and the date he was indicted, he was again arrested on a drug charge. All of these facts weigh in favor of detention and support the Magistrate Judge's decision.

What further bolsters the Court's decision to revoke Mayo's bond is the report provided by Officer DeMoss after the hearing.[4] This report, which details Mayo's unauthorized absences from his apartment, substantially undercuts Mayo's claims that his absences were both innocuous and justified. More than that, however, these reports evidence Mayo's dishonest representations to the court, which further demonstrates his refusal to comply with the court's orders. As a reminder, Mayo was told that he could only leave the apartment under two conditions, and only so long as he had obtained permission from Officer DeMoss. He could leave to take Ellis to the doctor or to meet with Mr. Woodley.[5] At the revocation hearing, Mayo admitted his absences were not for

---

[4] Mr. Woodley has indicated that he objects to this Court's consideration of Officer DeMoss's report, as the report was not produced at the hearing itself. Mr. Woodley has been provided with a copy of the report for his review, and he has not lodged any substantive objections to the information contained therein. As Mr. Woodley is aware, he asked Officer DeMoss for this very information at the hearing, when Officer DeMoss told him she did not bring the report with her to court that day. She provided the report to the defense soon after the hearing.

[5] The Court now understands that Mayo did not take Ellis to medical appointments. Instead, a transport van picked Ellis up from the apartment.

either of those purposes, but rather insisted they were to help Ellis down the stairs to the medical transport van, to meet the school bus, or to meet the mother of his children who was dropping off or picking up the kids. Officer DeMoss's report tells a different story.

The report reflects fifteen violations, and based upon the time of day those violations occurred, it is safe to say they did not involve meeting the school bus or helping Ellis to the transport van. On March 26, Mayo was gone for nine minutes between 6:11 p.m. and 6:20 p.m. On March 28, he was gone for fourteen minutes between 12:31 p.m. and 12:45 p.m. On March 29, 2019, he was gone for twenty-seven minutes between 10:37 p.m. and 11:04 p.m. On March 30, Mayo was again absent for twenty-seven minutes between 12:04 a.m. and 12:31 a.m. A few hours later that same day, at 3:29 a.m., the monitoring unit experienced a power loss; and then at 3:31 a.m. the base was moved. On April 1, Mayo absented himself two more times— from 8:47 p.m. to 8:55 p.m. for eight minutes and again from 10:17 p.m. to 10:32 p.m. for fifteen minutes. The following day on April 2, he was absent three times in quick succession: ten minutes between 5:49 p.m. and 5:59 p.m.; thirteen minutes between 6:01 p.m. and 6:14 p.m.; and twenty-one minutes between 6:15 p.m. and 6:36 p.m. On April 3, there was the thirty-seven minute absence discussed earlier. The following day, on April 4, Mayo was gone for seven minutes between 5:51 p.m. and 5:58 p.m. On April 5, there was a twenty-six minute absence between 10:24 a.m. and 10:50 a.m. Later that day, Mayo committed his final reported unauthorized leave when he was gone for nine minutes between 8:36 p.m. and 8:45 p.m. Plainly, many of these violations occurred after hours, at a time when

the proffered excuses (of meeting the school bus or helping Ellis to the transport van) seem incredible.

This Court finds Mayo's testimony in front of Magistrate Judge Hornsby was misleading at best, but seemingly closer to untruthful. Mayo undermined the conditions previously imposed on him and demonstrated a cavalier attitude about strict and consistent compliance with his monitoring conditions. He violated the court's orders over and over again. And just as significantly, Mayo has been dishonest with the court about just what he was doing during his repeated unauthorized absences.

Accordingly, this Court finds that there is no condition or combination of conditions which could assure the safety of the community if Mayo were released again. His consistent noncompliance with electronic monitoring demonstrates that there is no alternative to pre-trial detention. Magistrate Judge Hornsby's order revoking Mayo's bond and remanding him to the custody of the United States Marshal is hereby **AFFIRMED**.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, on this 20th day of June, 2019.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE